AUDREY STRAUSS
Acting United States Attorney for
the Southern District of New York
By: LOUIS PELLEGRINO
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Tel. (212) 637-2617

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA,
:
                 Plaintiff,         :    **VERIFIED CIVIL COMPLAINT**
                                                    **FOR FORFEITURE**
              v.                         :

$12,860.00 IN UNITED STATES CURRENCY,    :    20 Civ. _____

               Defendant-*in-rem*.    :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff United States of America, by its attorney Audrey Strauss, Acting United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

## JURISDICTION AND VENUE

1. This is a civil action *in rem* commenced by the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C) seeking the forfeiture of $12,860.00 in United States currency seized on or about November 28, 2017 ("Defendant-*in-rem*" or "Defendant Currency").

2. This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

1

3.  Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

## PROBABLE CAUSE FOR FORFEITURE

### Background on Medicaid

4.  Medicaid is a federal health care program that provides benefits to individuals and families who meet financial and other eligibility requirements.

5.  Under the United States Department of Health and Human Services ("HHS"), the Centers for Medicaid and Medicare Services ("CMS") is the federal agency responsible for overseeing the Medicaid program in participating states, including New York. Funding for Medicaid in New York is provided on a 50-50 basis by the federal government and New York state.

6.  When a Medicaid beneficiary fills a prescription at a pharmacy, Medicaid covers the cost of the dispensed medication. Since Medicaid is funded in part by the federal government, when Medicaid is defrauded, this causes a loss to the federal government.

### Background to the Investigation

7.  Beginning in or around 2016, the United States Food and Drug Administration, Office of Criminal Investigations (the "FDA-OCI") began investigating a scheme involving the unlawful diversion and trafficking of HIV prescription drugs that were previously dispensed to health care benefit program enrollees, including Medicaid recipients, in a national, underground market (the "Diversion Scheme").

8.  The prescription drugs in this case are not drugs of abuse, but rather are drugs designed to treat illnesses. The Diversion Scheme involved the purchase of HIV medications

2

that are originally dispensed to health care plan benefit enrollees, including Medicaid recipients, who then sell the drugs to third parties for the purpose of illegal resale of these HIV medications.

9. Once the HIV medications are purchased from actual patients, these second-hand medications are then sold to other participants in the scheme who gather bulk quantities of the medications and remove the labels from the bottles that bear the name of the patient who was originally prescribed the medication. This is done to try and make the bottles appear new for the purpose of concealing the fact that they had already been dispensed.

10. Once the labels are removed from the bottles, the medications are then sold to participants higher up the distribution chain, who ultimately sell the second-hand medications to pharmacies, who then dispense them to unsuspecting customers.

11. Since the HIV medications involved in the Diversion Scheme are not drugs of abuse, the bottles' high value depends on their appearing to contain new, unexpired drugs that legitimately have been obtained from manufacturers through authorized and licensed wholesale distributors.

12. The Diversion Scheme creates a potential danger to the customers of the second-hand HIV medications, because the bottles may have been exposed to potentially hazardous chemicals (to remove the labels) and the drugs themselves may have expired. Additionally, the drugs involved in the scheme are often stored in uncontrolled conditions such as car trunks, residences, and rented storage facilities, where they can be exposed to temperature extremes which may not be sufficient to maintain the medical efficacy of such drugs over time.

13. The Diversion Scheme participants rely on the fact that health care benefit plan enrollees, including Medicaid recipients, fill their prescriptions at little to no cost with the

intention of selling them into the underground market, rather than taking them as prescribed to treat their illnesses.

14. Although terms of policies vary, each health care benefit program policy requires that the benefits obtained pursuant thereto be for the sole use of the insured. Health care benefit programs, including Medicaid, would not have paid such benefits if the beneficiary had disclosed that they intended to sell the drugs to others, rather than taking the drugs themselves as prescribed.

15. Additionally, the purposeful concealment of the true source of the second-hand drugs defrauds the legitimate customers who unknowingly have their prescriptions filled with second-hand drugs that have been sold back to pharmacies as part of the scheme.

### The November 28, 2017 Seizure

16. In or about October 2017, the FDA-OCI investigators used a Confidential Source ("CS") to identify participants in the Diversion Scheme. The instant complaint relates to the seizure by the FDA-OIC from a participant in the scheme, George Bouyagian ("Bouyagian"), of approximately $12,860 in United States currency (*i.e.*, the Defendant-*in-rem*).

17. On or about October 19, 2017, the CS contacted a friend on Facebook and asked if they knew anyone currently buying second-hand medications. The CS's friend informed the CS of a person, later identified as Bouyagian, that was a potential buyer of second-hand medications.

18. The CS's friend said he had previously sold medication to Bouyagian and that he obtained second-hand medication for Bouyagian on a regular basis. According to the CS's friend, Bouyagian is well-known in the HIV medication collection business in California.

19. The CS told his friend he had multiple bottles to sell, for which Bouyagian would be willing to travel from California to New York.

20. On or about October 21, 2017, the CS received a message from a Facebook account listed as "George Bouyagian" from "Woodland Hills, California." The message contained a phone number and the words "George lets do this." In a follow up message, Bouyagian wrote to the CS, "Call me I will give u the most."

21. On or about November 12, 2017, the CS initiated a call with Bouyagian during which Bouyagian asked the CS for 122 bottles of Descovy, an HIV treatment drug. The CS indicated he was uncertain he had 122 bottles of Descovy, but would provide Bouyagian with a list of his inventory. They also discussed travel arrangements and a possible time to meet in New York.

22. Between in or about November 12, 2017 and November 21, 2017, the CS and Bouyagian engaged in multiple text messages and phone conversations, discussing drug prices and travel arrangements. During some of these exchanges, Bouyagian and the CS discussed an additional 472 bottles of various HIV medications that Bouyagian wanted to buy from the CS.

23. The CS provided a list via text message of bottles of medications that he had to sell and Bouyagian responded via text with specific dollar amounts he would be willing to pay per bottle. They arranged a meeting for November 28, 2017 at a hotel in New York, New York, where Bouyagian would pick up the HIV medications being offered by the CS.

24. On or about November 28, 2017, the CS met Bouyagian at the hotel in New York City equipped with an audio and video device, and agents with the FDA-OCI were stationed in the room next door to Bouyagian's room. Prior to the meeting, FDA-OCI agents had prepared 472 bottles of HIV medication, including Atripla, Complera, Truvada and others.

These drugs came from medication bottles that had previously been seized by the FDA-OCI. Some still had labels containing the names of the patients[1] who filled the prescription, the name of the dispensing pharmacy, and other information.

25. During the meeting, Bouyagian indicated that he had brought cash for the purpose of purchasing the second-hand HIV medications from the CS. Subsequent to Bouyagian showing the CS the cash, the CS contacted an FDA-OCI agent and informed the FDA-OCI that Bouyagian agreed to make an up-front payment of 10 percent of the asking price for the bottles, which was approximately $5,000. The CS then advised Bouyagian that a delivery driver was going to deliver the HIV medication bottles to the front of the hotel.

26. The delivery driver, an FDA-OCI agent, subsequently arrived at the hotel and the CS and Bouyagian met the driver outside of the hotel to unload the HIV medications. Bouyagian opened a box and examined its contents, and paid the FDA-OCI agent delivery driver approximately $4,000 in United States currency for the delivery.

27. The CS and Bouyagian took the HIV medication bottles to Bouyagian's hotel room and examined the delivery. Based on his review of the medications, Bouyagian indicated he was only willing to pay half price for bottles that had an expiration date of less than one year. Bouyagian also rejected bottles that had patient labels or HIV medications that had already expired.

28. The CS told Bouyagian that his source had other HIV medications that he could make available, including newer medications such as Descovy and Genvoya. Bouyagian advised the CS that he wanted approximately 250 bottles of Descovy and Genvoya. The CS then

---

[1] Law enforcement had spoken to some of the patients listed on the labels and determined that the patients had sold their HIV medications in exchange for cash to unknown individuals on the street. The patients interviewed were all Medicaid beneficiaries.

contacted the FDA-OCI Agent to discuss what Bouyagian was willing to pay for the HIV medications.

29. The CS and Bouyagian then exited the room and were placed under arrest. Bouyagian was indicted on February 8, 2018 and charged with one count of health care fraud, in violation of Title 18, United States Code, Section 1347.

30. Law enforcement agents recovered 472 bottles of medication[2] and an additional $8,860 in United States currency. A review of the bottles confirmed that they contained Truvada, Atripla, Complera and other HIV medications having an estimated Medicaid wholesale acquisition cost reimbursement value of approximately $800,000.

31. The Defendant-in-rem consists of the $4,000 in United States currency that Bouyagian paid to the FDA-OIC agent upon delivery of the HIV medications, as well as the $8,860 in United States currency recovered in Bouyagian's hotel room.

32. On or about November 19, 2018, Bouyagian pled guilty to one count of health care fraud, in violation of Title 18, United States Code, Section 1347.

### III. FIRST CLAIM FOR FORFEITURE

**Forfeiture Under 18 U.S.C. § 981(a)(1)(C)**
**(Property Constituting or Derived from Proceeds Traceable to a Violation of 18 U.S.C. § 1347, or Property Traceable to Such Property)**

33. The allegations contained in paragraphs one through thirty-two of this Complaint are incorporated herein.

34. Section 981(a)(1)(C) of Title 18, United States Code, subjects to civil forfeiture: Any property, real or personal, which constitutes or is derived from proceeds

---

[2] Since Bouyagian rejected some of the bottles, he was only charged with the 170 bottles he agreed to purchase, which was 53 bottles of Atripla and 117 bottles of Truvada, having a total estimated Medicaid reimbursement value of approximately $300,000.

traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

35. Title 18, United States Code, Section 1956(c)(7)(F) provides that "specified unlawful activity" includes "any act or activity constituting an offense involving a Federal health care offense" as that term is used in § 1956.

36. Title 18, United States Code, Section 24(a)(1), defines "Federal health care offense" as a violation of … Section 1347" 18 U.S.C. § 24(a)(1).

37. Title 18, United States Code, Section 1347, provides in relevant part,

> Whoever knowingly executes or attempts to execute a scheme or artifice (1) to defraud any health care benefit program, or (2) to obtain by false or fraudulent pretenses … any money or property owned or controlled by an health care benefit program in connection with the delivery of, or payment for, any health care benefits, items or services, shall be fined under this title, or imprisoned not less than 10 years or both.

18 U.S.C. § 1347.

38. Pursuant to 18 U.S.C. § 24(b), "health care benefit program" is defined as "…any public or private plan or contract, affecting commerce, under which any medical benefit, item or service is provided to any individual or entity who is providing a medical benefit, item or service for which payment may be made under the plan or contract." 18 U.S.C. § 24 (b). Medicaid is a "health care benefit program" as defined by the statute.

39. The Defendant Currency is subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C), because there is probable cause to believe that the Defendant Currency constitutes or is derived from proceeds traceable to health care fraud in violation of 18 U.S.C. § 1347.

40. By reason of the above, the Defendant Currency became, and is, subject to forfeiture to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Currency and that all persons having an interest in the Defendant Currency be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Currency to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
      July 7, 2020

                            AUDREY STRAUSS
                            Acting United States Attorney for
                            the Southern District of New York
                            Attorney for the Plaintiff
                            United States of America

By: _____
      LOUIS PELLEGRINO
      Assistant United States Attorney
      One St. Andrew' Plaza
      New York, New York 10007
      Tel. (212) 637-2617

## VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK           :
SOUTHERN DISTRICT OF NEW YORK )

SPECIAL AGENT Thomas Nasiatka, being duly sworn, deposes and says that he is a Special Agent with the United States Food and Drug Administration, Office of Criminal Investigations ("FDA-OCI"), and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information and belief.

The sources of deponent's information and the ground of his belief are conversations with other law enforcement officers and others, official records and files of FDA-OCI and the United States Government, and information obtained directly or indirectly by deponent during an investigation of alleged violations of Title 18, United States Code.

*[signature]*
THOMAS NASIATKA
Special Agent
United States Food and Drug Administration
Office of Criminal Investigations

Sworn to before me this
30th day of June, 2020

*[signature]*

KEVIN C. GORMAN
Notary Public, State of New York
No. 02GO6161201
Qualified In Putnam County
Commission Expires February 20, 2023

NOTARY PUBLIC

10